# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES A. ZACHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9729-VCG |
| | ) | |
| REAL TIME CLOUD SERVICES, LLC, | ) | |
| SANGEETA CHHABRA, and CBS | ) | |
| ACCOUNTING PRIVATE, LIMITED, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| REAL TIME DATA SERVICES, LLC, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 20, 2019
Date Decided: March 31, 2020

James A. Zachman, *Pro Se.*

Edward McNally and Kathleen Murphy, of MORRIS JAMES LLP, Wilmington, Delaware, *Attorneys for Defendants and Intervenor-Defendant.*

GLASSCOCK, Vice Chancellor

This elderly action results from the inability of the principals of a Delaware LLC to work together. Eventually, the Plaintiff here, James Zachman, was forced out of the LLC at an unfair price following an unfair process. Claims and counterclaims resulted; the LLC is run from India, which made discovery difficult and slow; the Plaintiff proceeded *pro se*, further complicating the litigation; in sum, progress has been testudinal.[1] I will not recount here the several prior rulings of this Court, which interested readers, if any, may themselves peruse.[2] The remaining issues are the fair value of the Plaintiff's interest, as well as any set-off appropriate under the Intervenor-Defendant's counterclaims. The Defendants and Intervenor-Defendant bear the burden on both these issues. This post-trial Memorandum Opinion resolves these issues.

Using standard valuation techniques, I find that the fair value of the Plaintiff's interest is $173,000, and that the Intervenor-Defendant has not proved its counterclaims for damages. My analysis is below.

---

[1] I have sworn off the adjective "glacial," which once aptly invoked progress so slow as to be imperceptible; in light of the current climate, it better implies rapid retreat.

[2] Transcript Ruling of the Court on Defs.' Mot. for Summ. J. - July 28, 2016, Docket Item ("D.I.") 128 ("July 28, 2016 Ruling"); Transcript of the 2-26-18 Oral Argument and Ruling of the Court, D.I. 202 ("February 26, 2018 Ruling"); 3-5-2019 Oral Argument, D.I. 240 ("March 5, 2019 Ruling").

# I. BACKGROUND[3]

*A. The Parties*

Plaintiff James A. Zachman co-founded Intervenor-Defendant Real Time Data Services, LLC ("Real Time Data" or the "Company") in 2006.[4]

Intervenor-Defendant Real Time Data is a Delaware limited liability company that provides QuickBooks hosting services.[5]

Defendant CBS Accounting Private, Limited ("CBS Accounting") is an Indian company that provides bookkeeping services.[6] CBS Accounting co-founded Real Time Data with Zachman.[7]

Defendant Sangeeta Chhabra founded CBS Accounting.[8] She also co-managed Real Time Data with Zachman.[9] Later, she founded non-party Real Time Data Services Private Limited ("Real Time Data SPL") to provide support for Real

---

[3] The parties submitted separate trial exhibits. Citations to the Plaintiff's Trial Exhibits are expressed as PX __, at __. Citations to the Defendants' Trial Exhibits are expressed as DX __, at __. Citations in the form "Trial Tr." refer to the trial transcript. Pagination in some trial exhibits is non-existent or handwritten, and I note this where appropriate.

[4] DX 3, Real Time Data Services, LLC Operating Agreement ("Operating Agreement"); Trial Tr. 9:7–12 (Chhabra).

[5] Operating Agreement; Trial Tr. 9:1–12 (Chhabra).

[6] Trial Tr. 7:17–24 (Chhabra).

[7] Operating Agreement, Ex. A, "Members."

[8] Trial Tr. 9:7–12 (Chhabra); *see also* Operating Agreement, Ex. A, "Members" (Identifying Zachman and Chhabra on behalf of CBS Accounting as LLC signatories).

[9] Operating Agreement, Ex. C, "Officers."

Time Data.[10]  In 2012, Chhabra, through Real Time Data SPL, founded Defendant Real Time Cloud Services, LLC ("Real Time Cloud").[11]

Zachman founded non-party Cloudvara.com ("Cloudvara") after his departure from Real Time Data.[12]

*B. Factual Background*

1. <u>Zachman and CBS Accounting Co-Found Real Time Data</u>

Originally, starting in 2004, CBS Accounting, owned by Chhabra and based in India, provided bookkeeping services to customers in the United States.[13]  Over the next few years, it evolved its business toward providing "QuickBooks hosting."[14] Under this business model, CBS Accounting provided computer servers used to facilitate the operation of QuickBooks software on customers' computers.[15]  CBS Accounting did not actually supply the software; it supplied the remote servers to run the software.[16]

---

[10] Trial Tr. 67:5–17 (Chhabra).

[11] DX 17, at -556 (Zachman email from November 2012 discussing Chhabra's creation of Real Time Cloud); Trial Tr. 54:17–55:4 (Chhabra) (testifying she founded Real Time Cloud in June 2012); PX Q, Declaration in Superior Court of California, County of Riverside, ¶ 17 (Chhabra declaring that Real Time Data SPL founded Real Time Cloud).

[12] DX 15 (emails from Zachman describing founding of Cloudvara).

[13] Trial Tr. 7:12–24 (Chhabra).

[14] *Id.*

[15] *Id.*

[16] *Id.* at 8:2–16 (Chhabra).

3

Toward the end of 2004, Chhabra met the Plaintiff, Zachman, who operated an accounting firm in the United States.[17] On March 12, 2006, Chhabra and Zachman joined forces and formed a limited liability company, Real Time Data.[18] Like CBS Accounting, Real Time Data focused on QuickBooks hosting.[19] Real Time Data had two members: Zachman and CBS Accounting.[20] Zachman and Chhabra served as Real Time Data's managers.[21] Zachman, who was based in the United States and had marketing experience, ran the marketing arm of the business, first through direct marketing, then through digital campaigns.[22] The digital campaigns, particularly search engine optimization through Google, proved effective, and after a slow start, the company began to grow.[23]

Meanwhile, in India, CBS Accounting provided hosting, tech, and billing support to Real Time Data.[24] As Real Time Data grew, it hired more employees in addition to Zachman.[25] Chhabra started another company, Real Time Data SPL, to

---

[17] *Id.* at 8:17–9:6 (Chhabra).

[18] Operating Agreement; Trial Tr. 9:7–12 (Chhabra).

[19] Trial Tr. 8:21–9:12 (Chhabra).

[20] Operating Agreement, Ex. A, "Members."

[21] Operating Agreement, Ex. C, "Officers."

[22] Trial Tr. 10:9–21 (Chhabra).

[23] *Id.* at 11:2–13 (Chhabra). After three years of business, in 2009, Real Time Data's net income was around $45,000. *See* DX 23, Ex. 1 (calculating 2009 adjusted net income of $43,864); Trial Tr. 40:18–41:2 (Chhabra) (testifying that 2009 unadjusted net income was $47,816).

[24] Trial Tr. 25:1–12 (Chhabra).

[25] *Id.* at 25:13–26:1 (Chhabra).

4

allow the Real Time Data business to add employees while circumventing regulatory strictures in India on companies with more than twenty employees.[26] Zachman testified he was unaware Chhabra had started an additional company to provide services to Real Time Data, but contemporaneous emails show that Zachman corresponded with employees from Real Time Data SPL.[27] Because Real Time Data was a startup and initial revenue was small, neither Zachman nor Chhabra drew a salary; instead, they agreed to equally split Real Time Data's net income.[28]

### 2. Real Time Data's Accounting Practices and Management Disputes

Zachman received accounting reports and reviewed the Company's finances on annual trips to India.[29] In addition, he communicated with Real Time Data's accountants, who answered his inquiries and provided him with viewing access to the company's accounting records.[30] Some sensitive accounting information,

---

[26] *Id.* at 25:20–26:12 (Chhabra).

[27] *Id.* at 196:24–198:17 (Zachman) (testifying that despite corresponding with Real Time Data SPL employees regarding Real Time Data business and numerous payments to Real Time Data SPL from Real Time Data's PayPal, Zachman was unaware whether the business was providing services to Real Time Data); DX 31 (emails showing Zachman corresponded with Real Time Data SPL employees regarding Real Time Data business).

[28] Trial Tr. 39:5–8 (Chhabra).

[29] *Id.* at 27:5–21 (Chhabra).

[30] DX 7 (emails documenting Zachman's correspondence with Real Time Data employees regarding accounting and accounting records from 2007 to 2012); Trial Tr. 28:13–32:3 (Chhabra).

however, remained inaccessible to Zachman, although it was accessible to his wife, who helped with Real Time Data's accounting.[31]

To facilitate customer payments, Real Time Data used several banking services during its early years, including Bank of America until 2008, then Wachovia Bank (which was taken over by Wells Fargo) and PayPal (a non-bank merchant service) in 2009.[32] Because the vast majority of Real Time Data's customers were in the United States, most paid for the Company's services with checks and credit card payments deposited in Real Time Data's United States bank accounts.[33] Zachman, as the United States liaison for the business, had access to these accounts and was able to make withdrawals to pay the Company's bills and draw his membership share.[34]

---

[31] *See* PX O, at 1 (screenshot indicating Zachman's lack of access to "Sensitive Accounting Activities"); Trial Tr. 65:3–67:2 (Chhabra) (testifying that Zachman's wife had access to "Sensitive Accounting Activities" on the Company's QuickBooks); DX 7, at 31 (email from accountant Shikha Bajaj responding to Zachman's request for "Admin" access to QuickBooks that he "can have the access to that file using [Zachman's Wife's] User id.").

[32] Trial Tr. 12:17–13:1 (Chhabra). Contemporaneous emails between Zachman and Chhabra show that Zachman was aware of the PayPal account opened in 2009. DX 6 (emails dated October 23–24, 2009, December 2, 2009, and January 26, 2010 discussing usernames and setting up and accessing PayPal account); *see also* Trial Tr. 22:22–24:24 (Chhabra) (testifying she communicated with Zachman regarding the PayPal account). Despite this evidence, Zachman contends he did not know of the PayPal account. I do not credit his testimony in this regard. For further discussion, see footnote 176, *infra*.

[33] Trial Tr. 11:23–15:4 (Chhabra); DX 4 (Defendants' graphic representation of bank accounts and access).

[34] *E.g.* DX 25, at 60 (Wells Fargo bank statement showing Zachman's draws on account); Trial Tr. 16:19–18:2 (Chhabra) (testifying regarding Zachman's access). The page numbers in DX 25 are handwritten.

6

For the first several years of operations, Real Time Data's accounting practices were inconsistent.[35] They began to improve once the Company's revenues grew and it hired an accountant, Shikha Bajaj, in 2010.[36] However, both Zachman and Chhabra had grievances related to the other's behavior regarding accounting and taxes. In 2010, it came to light that Zachman, although named "Tax Matters Member" under the Real Time Data Services, LLC Operating Agreement (the "Operating Agreement"), had never filed taxes for Real Time Data.[37] For his part, Zachman was concerned over the accounting practices and the unorganized system of drawing on Company funds, and he suggested hiring a certified public accountant to reconcile the past several years of accounting.[38] In 2010, Zachman filed for personal bankruptcy, but, as I found in a previous ruling, Chhabra was unaware of his bankruptcy when it occurred.[39]

---

[35] Trial Tr. 32:4–23, 71:7–18 (Chhabra).

[36] *Id.*

[37] Operating Agreement, § 5.4 (naming Zachman "Tax Matters Member"); DX 10 (emails dated December 24–25, 2011 discussing tax returns); Trial Tr. 42:7–43:2 (Chhabra). After Zachman left the Company, Real Time Data failed to file taxes in 2012 because, as Chhabra testified, she was afraid the failure to file in the past would come to light. Trial Tr. 90:13–24 (Chhabra).

[38] Trial Tr. 98:2–22 (Chhabra).

[39] *See id.* at 59:10–13, 94:20–24, 101:12–21 (Chhabra) (testifying that Zachman's bankruptcy occurred in 2010 and that she did not know about it). Zachman testified that Chhabra was aware of his personal bankruptcy. *Id.* at 179:15–22 (Zachman). I ruled on this issue in a summary judgment bench ruling, finding the record did not support knowledge on Chhabra's part. July 28, 2016 Ruling, at 6:15–18 ("The record does not support the plaintiff's allegation that the defendants knew of the plaintiff's bankruptcy in 2010, although they were well aware of his financial difficulties.").

By the time the Company reached its sixth year of operations in 2012, Zachman and Chhabra each believed the other was manipulating the Company's accounts for personal benefit. Chhabra suspected Zachman was making illegitimate draws from the Company's United States bank accounts, using his control of those accounts to draw more than his fifty-percent share of net income.[40] Further investigation led her to conclude that he had overdrawn the accounts in the amount of $48,720 during his time with the Company.[41] Zachman, in turn, suspected that Chhabra was inappropriately transferring money to the companies in India, where *she* could exercise control over the funds.[42]

In March 2012, Zachman visited India, and the disputes between the business partners came to a head.[43] In late March, shortly after his return, Zachman unilaterally opened a new bank account for Real Time Data at U.S. Bank and began to deposit revenues in this account.[44] Zachman's practice was to deposit revenues in the U.S. Bank account, then transfer a portion of those revenues to the Company's

---

[40] Trial Tr. 39:20–42:5, 88:16–89:1 (Chhabra), 217:21–218:7 (Zachman).

[41] DX 9, at 1 (Defendants' summary of alleged excess draws by Zachman).

[42] *E.g.* Trial Tr. 164:22–165:3 (Zachman testifying he was angry with Chhabra in late 2009 because she would "take money to India" when the Company needed it to pay vendors in the United States), 165:22–166:5 (Zachman testifying that money would be in the PayPal account, then he would find "they had already withdrawn the funds and they were off to India.").

[43] *Id.* at 83:1–84:2 (Chhabra); DX 16 (Defendants' timeline of events noting March 23, 2012 meeting leading to disputes).

[44] Trial Tr. 44:5–22 (Chhabra); DX 12 (transaction records for U.S. Bank account).

8

Wells Fargo bank account.[45] He acknowledged he kept money back in the U.S. Bank account and spent it on personal expenses (including a lawsuit against Chhabra in California), but he testified that he counted these funds as part of his membership draw or that he intended to pay them back.[46] Although Zachman had indicated to Chhabra in emails that he wanted to streamline the Company's revenue deposits to eliminate the use of multiple accounts, he did not inform Chhabra when he opened the U.S. Bank account.[47] He testified that while he did not tell Chhabra about his numerous personal draws on the account, it did not matter because she learned about them through the bank statements.[48] There is no evidence, however, that Zachman provided the bank statements for the U.S. Bank account to Real Time Data.[49] Chhabra discovered the new bank account in May 2012.[50] Chhabra calculated the total funds she believed he wrongfully retained in the U.S. Bank account to be $63,213.20.[51]

---

[45] Trial Tr. 44:23–46:17 (Chhabra).

[46] *Id.* at 218:2–219:15 (Zachman); DX 13 (Zachman's interrogatory response summarizing U.S. Bank draws).

[47] Trial Tr. 44:5–22 (Chhabra), 167:19–168:18 (Zachman) (testifying he informed Chhabra he was contemplating streamlining revenue deposits by starting a new bank account).

[48] *Id.* at 223:18–224:15 (Zachman).

[49] *Id.* at 224:16–20, 227:6–19 (Zachman).

[50] *Id.* 44:15–18 (Chhabra).

[51] DX 9, at 2; Trial Tr. at 44:23–47:9 (Chhabra).

Around this time, Zachman began to take steps to form a competing company, Cloudvara, including, on May 9, 2012, purchasing a website for his new company.[52]

### 3. Chhabra Terminates Zachman's Employment with Real Time Data

In May 2012, Zachman traveled to India again, in part to attempt to amicably resolve differences with Chhabra over the business, but the two did not end up meeting.[53]  On May 16, 2012, after Zachman's return to the United States, Chhabra removed Zachman as manager of Real Time Data due to his 2010 personal bankruptcy.[54]  Chhabra sent a Company-wide email regarding the termination that stated it was due to mismanagement of Company funds, failure to file the Company's taxes, as well as Zachman's personal bankruptcy filing in 2010.[55]  In addition, Chhabra wrote to several Real Time Data clients, stating that Zachman had been terminated due to "financial misappropriation of funds."[56]  Though he was

---

[52] *See* DX 16 (Defendants' timeline of events noting purchase of website); DX 15 (Zachman's solicitation email date May 19, 2012 describing Cloudvara as "an improved application hosting experience.").

[53] Trial Tr. 84:3–85:4 (Chhabra).  Chhabra testified she waited for Zachman at a hotel in New Delhi, and he failed to show. Trial Tr. 92:22–93:7 (Chhabra).  Zachman testified that he invited her to discuss the partition of the Company in Delaware, but she declined the invitation. Trial Tr. 179:8–13 (Zachman).

[54] *Id.* at 179:16–17 (Zachman testifying "I've been removed as a manager because of my bankruptcy filing. . ."); *see also* DX 15 (Zachman emailing Real Time Data customers noting his date of departure as May 16, 2012); Trial Tr. 48:4–10 (Chhabra) (testifying Zachman was terminated in May 2012).

[55] Trial Tr. 87:9–89:1 (Chhabra).

[56] PX D (email dated May 23, 2012); Trial Tr. 99:8–100:8 (Chhabra).

terminated as a managing member, under Delaware law Zachman retained his economic interest in Real Time Data.[57]

In June 2012, following Zachman's departure, Chhabra, through Real Time Data SPL, started a new business, Real Time Cloud.[58]

### 4. Zachman Competes through Cloudvara, and Chhabra Eliminates His Interest in Real Time Data

Following his termination, Zachman took actions aimed at prohibiting Real Time Data's ability to operate in the United States. He ceased making payments to Real Time Data vendors, and he contacted Real Time Data's service provider seeking to restrict access for the Company.[59] Through his son, Zachman contacted a Chicago attorney who was helping Real Time Data open a bank account and threatened to get him disbarred.[60] He filed a complaint with PayPal, alleging that Chhabra stole his identity.[61] In that complaint, Zachman claimed he was the "sole

---

[57] *See* Trial Tr. 93:8–24 (Chhabra). I ruled previously on this issue. July 28, 2016 Ruling, at 7:5–8 ("Therefore, while Mr. Zachman did not retain, post-bankruptcy, the same managerial rights that flowed from his membership, he retained certain economic rights.").

[58] Trial Tr. 54:17–55:4, 67:5–17 (Chhabra); PX Q, Declaration in Superior Court of California, County of Riverside, ¶ 17.

[59] DX 16-A (Zachman informing Chhabra on May 18, 2012 that he will not make vendor payments until he is given access to Real Time Data platforms); DX 16-B (Zachman emailing service provider requesting emergency administrative privileges and suspension of access by others at Real Time Data); *see also* Trial Tr. 48:24–50:12 (Chhabra).

[60] DX 16-D (Zachman's son writing about attorney who assisted Real Time Data that he "will lose his ability to practice law for the rest of his life"); Trial Tr. 51:1–52:3 (Chhabra). Zachman filed a lawsuit in Illinois against this Chicago lawyer. Trial Tr. 52:2–3 (Chhabra).

[61] *See* DX 16-C.

manager" of Real Time Data.[62]  He sent letters to a company, USA2Me, to prevent Real Time Data from acquiring a United States address.[63]  He filed complaints with the police and the United States Postal Service regarding another individual attempting to assist Real Time Data to open a new bank account in the United States.[64]  Finally, having closed Real Time Data's bank account at Wells Fargo—thus making PayPal the Company's sole means to receive payments—Zachman attempted several times after his termination to block Real Time Data's access to its PayPal account.[65]

Also following his removal as manager, Zachman began to contact Real Time Data's customers to recruit them to join his new company, Cloudvara.[66]  At least one of Zachman's solicitations included a warning against continuing to do business with Real Time Data: "My primary concern with my former clients is that [Real Time Data] is now controlled by an India operation which provides you no recourse should

---

[62] DX 16-C; Trial Tr. 50:13–24 (Chhabra).

[63] DX 16-H; Trial Tr. 54:5–16 (Chhabra).

[64] DX 16-E; Trial Tr. 52:4–22 (Chhabra).

[65] *See* DX 16-G (response from PayPal regarding Zachman's complaints); Trial Tr. 52:23–54:4 (Chhabra).

[66] DX 15; Trial Tr. 57:2–58:8 (Chhabra).

there be any issues. I would suggest that you consider an alternative."[67] Real Time Data began to experience high rates of customer attrition.[68]

In October 2012, Chhabra decided to eliminate Zachman's interest in Real Time Data through a merger (the "Merger").[69] In determining a value, Chhabra chose the number that Zachman assigned to his interest in his 2010 bankruptcy petition: $3,487.50.[70] Contending that Zachman's post-termination actions had "caused financial harm" to Real Time Data, Chhabra applied the value of Zachman's interest against what she alleged he owed the Company and paid him nothing.[71] At trial, Chhabra acknowledged that these choices did not comport with the fair value owed to Zachman under Delaware law for his interest in the company.[72]

Although Chhabra's other business, Real Time Cloud, existed from June 2012, it conducted no substantial business until October 2012.[73] With Real Time

---

[67] DX 15 (June 27, 2012 email); Trial Tr. 57:23–58:8 (Chhabra). DX 15 does not include page numbers.

[68] Trial Tr. 58:9–20 (Chhabra).

[69] *Id.* at 58:21–59:3 (Chhabra). The Amended Complaint states the date of the Merger was October 29, 2012. First Am. Compl., D.I. 77 ("Am. Compl."), ¶ 4. The Defendants' valuation expert identified the Merger date as October 28, 2012. Trial Tr. 118:6–10 (Seitz).

[70] Am. Compl., Ex. G ("November 25, 2012 Letter"). Zachman included the November 25, 2012 Letter as an exhibit with his Amended Complaint, but he did not include it in his trial exhibits. The Defendants have not disputed the amount they originally assigned to his interest.

[71] *See id.*

[72] Trial Tr. 59:14–17 (Chhabra) (testifying that "on flashback, I very deeply apologize, we should have gone by the Delaware rules. I was actually not so much aware of it. And we should have determined the fair value.").

[73] *Id.* at 55:2–56:6 (Chhabra).

Data beginning to lose money, and in coordination with the Merger, Chhabra migrated Real Time Data's customers to Real Time Cloud.[74] Chhabra testified that the customers switched voluntarily, but there were no written communications asking customers for consent to move their business.[75] Instead, it appears that Chhabra notified the customers that they would receive invoices from Real Time Cloud rather than Real Time Data, and she considered the business voluntarily moved when the customers paid the invoices.[76]

### 5. The Experts' Valuations of Zachman's Economic Interest in Real Time Data

At trial, each side offered a valuation expert to opine on the fair value of Zachman's fifty-percent economic interest in Real Time Data.

#### a. The Defendants' Expert, Paul Seitz

The Defendants' valuation expert, Paul Seitz, offered his report (the "Seitz Report") based on financial information from the QuickBooks provided by Real Time Data.[77] He selected October 31, 2012 as the relevant valuation date because it

---

[74] *Id.* at 59:18–60:17 (Chhabra); PX Q, Declaration in Superior Court of California, County of Riverside, ¶ 17.

[75] Trial Tr. 67:18–68:18 (Chhabra); PX Q, Declaration in Superior Court of California, County of Riverside, ¶ 17.

[76] Trial Tr. 67:18–68:18 (Chhabra); PX Q, Declaration in Superior Court of California, County of Riverside, ¶ 17.

[77] DX 23 ("Seitz Report"), at 1–2; Trial Tr. 136:23–139:1 (Seitz).

was the closest month-end to the date of the Merger.[78] He considered three potential approaches to valuation: the asset based approach, the market approach, and the income approach (which includes the discounted cash flow (DCF) approach and the income capitalization approach).[79] Ultimately, he selected the income capitalization approach.[80]

Seitz applied two key adjustments to Real Time Data's income prior to applying his discount rate. First, he excluded lost revenues for the clients who left between Zachman's termination as manager and the elimination of his economic interest through the Merger.[81] In other words, Seitz assumed that the Company's loss of customers was permanent, and that it would grow at a steady rate from its reduced client base as of October 2012.[82] Next, Seitz adjusted the income as he deemed appropriate to account for taxes, litigation expenses, and the fact that neither

---

[78] Seitz Report, at 1; Trial Tr. 118:6–10 (Seitz). Because this date did not match up with the Company's fiscal year, Seitz employed a trailing 12-month period to create annualized numbers. Trial Tr. 120:3–8 (Seitz).

[79] Seitz Report, at 9; Trial Tr. 118:11–119:14 (Seitz).

[80] Seitz Report, at 10; Trial Tr. 118:11–119:14 (Seitz). As a service business, the assets on Real Time Data's balance sheet would not reflect its true value; similarly, insufficient market data made using a market approach undesirable. Seitz Report, at 9. The Company's fluctuating income and lack of financial forecasts made a DCF model difficult in Seitz' opinion, thus making the income capitalization the optimal approach in his view. Seitz Report, at 9–10.

[81] Seitz Report, at 12; Trial Tr. 120:9–121:3 (Seitz).

[82] Seitz testified that he did not take the cause of these departures into account; only the financial results for Real Time Data's income. Trial Tr. 141:11–142:5 (Seitz).

Zachman nor Chhabra took a salary.[83] Excluding the lost revenue from the departed customers, Seitz concluded that Real Time Data showed an annualized income of $41,165.[84]

To arrive at his discount rate, Seitz added equity risk, industry risk, size risk, and specific company risk premiums to the risk free rate.[85] He based his company-specific risk premium on the volatility caused by Real Time Data's management disputes and Zachman's competition at Cloudvara.[86] Seitz also concluded that Real Time Data essentially had no growth potential, and thus its growth rate should match the inflation rate at 2%.[87] Seitz' final capitalization rate was 14.25%, which, applied to his annualized income created a value for Real Time Data of $265,000.[88] Therefore, under Seitz' analysis, Zachman's fifty-percent interest was worth $132,500.

---

[83] Seitz Report, at 12–13; Trial Tr. 121:4–122:17 (Seitz).

[84] Seitz Report, Ex. 3, at 1; Trial Tr. 122:18–123:10 (Seitz). With the lost revenue added back, Seitz calculated annual income at $97,273. Seitz Report, Ex. 3, at 1.

[85] Seitz Report, Ex. 2, at 1; Trial Tr. 123:21–128:7 (Seitz).

[86] Seitz Report, Ex. 2, at 1; Trial Tr. 123:21–128:7 (Seitz).

[87] Seitz Report, Ex. 2, at 1; Trial Tr. 123:21–128:7 (Seitz).

[88] Seitz Report, Ex. 3, at 1; Trial Tr. 128:24–129:8 (Seitz).

### b. The Plaintiff's Expert, Derek Thomas

Zachman's expert, Thomas, did not base his valuation report (the "Thomas Report") on the QuickBooks provided by Real Time Data.[89] Instead, Zachman recreated the Company's financials from scratch "based on source documents," gave these numbers to an accounting firm to create new QuickBooks files, and the accounting firm provided this information to Thomas for his valuation.[90] In conducting his valuation, Thomas did not review the QuickBooks files provided by Real Time Data or attempt to reconcile the numbers.[91] He communicated with the accounting firm and confirmed with them that they based the numbers on bank and PayPal statements provided by Zachman.[92] Thomas testified he did not use the numbers the Company provided due to Zachman's doubts about their accuracy.[93] Also differing from Seitz, Thomas used the date of Zachman's termination as manager in May 2012 for his valuation, rather than the date of the Merger in October 2012.[94]

---

[89] PX R ("Thomas Report"), at 2; Trial Tr. 238:6–239:8 (Thomas).

[90] Thomas Report, at 2; Trial Tr. 238:6–239:8, 255:24–257:12 (Thomas).

[91] Trial Tr. 254:17–255:2, 255:24–257:12 (Thomas).

[92] *Id.* at 256:24–257:12 (Thomas).

[93] *Id.* at 249:8–250:4 (Thomas).

[94] Thomas Report, at 1.

Like Seitz, Thomas employed an income-based approach, but he used a DCF model for his valuation.[95] He decided on this model because he believed it was the best fit for an early stage growth company.[96] Because the company did not make financial projections, Thomas created his own projections, forecasting a 30% growth rate for five years, followed by a terminal growth rate of 5%.[97] He made this determination based on Real Time Data's 50% year-to-year growth leading up to the Merger.[98]

In determining Real Time Data's income, Thomas added back in the loss of business the Company experienced due to management disputes and Zachman's solicitations from Cloudvara, contending that the Company would heal from this temporary disruption and return to normal levels of growth.[99] In determining expenses, Thomas used Zachman's estimates of operational expenses in India.[100] Thomas then adjusted for expenses he imagined the Company might require in the future as it grew, such as the addition of another United States employee, rent, telephone service, and salaries for Zachman and his wife.[101]

---

[95] *Id.* at 12; Trial Tr. 240:17–19, 243:19–244:14 (Thomas).

[96] Trial Tr. 240:17–19, 243:19–244:14 (Thomas).

[97] *Id.*

[98] Thomas Report, at 3.

[99] Trial Tr. 242:16–243:10 (Thomas).

[100] *Id.* at 245:3–18 (Thomas).

[101] Thomas Report, at 4; Trial Tr. 245:19–248:8 (Thomas).

Having made these adjustments to income, Thomas' DCF model produced an equity value for Real Time Data at the time of Zachman's termination of $3,364,554, of which Zachman's half was worth (rounded) $1,682,000.[102]

*C. Procedural History*

Each phase of this litigation was lengthened by discovery disputes, which I refrain from recounting in full except where pertinent. Motion practice was also complicated by the Plaintiff filing "Notices," which were essentially supplements to his operative complaint with ongoing allegations of wrongdoing as he uncovered facts during discovery, as well as arguments regarding what he felt the evidence proved.[103]

The Plaintiff filed his original complaint on June 3, 2014 (the "Original Complaint").[104] The Original Complaint brought four counts against the Defendants: (I) breach of contract, (II) fraud, (III) breach of fiduciary duty, and (IV) a demand for access to accounting records.[105] Motion practice followed. The

---

[102] Thomas Report, at 11–12; Trial Tr. 255:24–257:12 (Thomas).

[103] *See* Notice to Court, D.I. 120; Notice to Court, D.I. 103; Notice to Court, D.I. 101; Notice to Court, D.I. 100; Notice to Court, D.I. 96; Notice to Court, D.I. 92; Notice to Court, D.I. 86.

[104] Compl. for Damages, Debt or Breach of Contract, D.I. 1 ("Original Compl.").

[105] *Id.* at 3–13. The Original Complaint also contained claims for libel and identity theft, but the text of these claims was in strikethrough script, with a notation that they had been "Dismissed in Superior Court." *Id.* at 10–12.

Defendants moved to dismiss.[106] The Plaintiff attempted to freeze the Defendants' assets through emergency injunctive relief.[107] Both parties filed discovery motions.[108] In November 2014, the Defendants renewed their motion to dismiss.[109] In March 2015, the Plaintiff renewed his request for emergency injunctive relief.[110]

The Defendants answered the Plaintiff's Original Complaint on May 13, 2015.[111] At the same time, Real Time Data moved to intervene as Defendant to file counterclaims.[112] On June 12, 2015, the Plaintiff moved to amend his Original Complaint.[113] I granted the Motion to Intervene from Real Time Data as well as the Plaintiff's Motion to Amend on August 5, 2015.[114] The Plaintiff's amended complaint (the "Amended Complaint") contained five counts: (I) breach of contract,

---

[106] Defs. Real Time Cloud Services, LLC, Sangeeta Chhabra and CBS Accounting Pvt. Ltd.'s Mot. to Dismiss the Compl., D.I. 12.

[107] Motion for Expedited Proceedings, D.I. 14; Mots. Request Escrow and Custodianship by Court of All Funds or Assets of Def. Real Time Cloud Services Including Prelim. Inj., Asset Freeze & Other Emergency Relief, D.I. 13.

[108] Defs. Mot. to Stay Disc., D.I. 17; Mot. to Compel Disc., D.I. 28.

[109] Defs.' Renewed Mot. to Dismiss, D.I. 48.

[110] Mot. for Immediate Prelim. Inj., D.I. 57.

[111] Def. Real Time Cloud Services, LLC's Answer, D.I. 68; Defs. Sangeeta Chhabra and CBS Accounting Services Pvt. Ltd.'s Answer, D.I. 70.

[112] Non-Party Real Time Data Services, LLC's Mot. to Intervene, D.I. 71.

[113] Mot. to Amend Compl., D.I. 76.

[114] *See* D.I. 87.

(II) unjust enrichment, (III) breach of fiduciary duty, (IV) civil conspiracy, and (V) a request for books and records.[115]

On December 15, 2015, the Defendants moved for partial summary judgment.[116]  Resolution of this motion was complicated by ongoing discovery disputes and various motions from the Plaintiff.[117]  In a July 28, 2016 bench ruling (the "July 28, 2016 Ruling"), I granted the Defendants' Motion for Partial Summary Judgment on Counts I, II, IV, and V of the Amended Complaint.[118]  At that bench ruling, I determined that the Plaintiff had been terminated by operation of law under 6 *Del. C.* § 18-304 due to his personal bankruptcy in 2010.[119]  This ruling left Count III, the breach of fiduciary duty, as the sole remaining claim.[120]  I specified at that

---

[115] Am. Compl.

[116] Defs. Real Time Cloud Services LLC, Sangeeta Chhabra, and CBS Accounting Pvt. LTD's Mot. for Partial Summ. J., D.I. 104.

[117] *See* Tr. of 2.9.16 Telephonic Scheduling Conference, D.I. 114.  The Plaintiff filed a request to defer the Motion for Partial Summary Judgment (D.I. 107), a Motion in Support of Evidence (D.I. 111), and a Motion for Books and Records (D.I. 113).  At my direction, the Plaintiff synthesized these filings into an answer to the Motion for Partial Summary Judgment.  Pl.'s Opp'n to Mot. of Partial Summ. J. and Reply, D.I. 117.  However, after briefing completed, the Plaintiff then supplemented his response with a "Notice to Court" regarding evidence from discovery.  Notice to Court, D.I. 120.  I rejected the Notice to Court as an inappropriate sur-reply and considered the matter submitted for decision.  Ltr. to Litigants, D.I. 121.  The Defendants then filed a Motion for Injunctive Relief seeking to enjoin the Plaintiff from litigating identical claims in federal court in the Western District of Pennsylvania.  Defs.' Mot. for Inj. Relief, D.I. 122.  I denied this motion as moot on July 28, 2016.  *See* July 28, 2016 Ruling.

[118] July 28, 2016 Ruling, at 7:11–9:13.

[119] *Id.* at 5:18–7:10.

[120] *Id.* at 9:12–13.

time that I viewed the remedy for the breach of fiduciary duty as essentially a valuation exercise of the fair value of the Plaintiff's interest in Real Time Data.[121]

The Plaintiff proceeded with his claim for breach of fiduciary duty. This commenced a contentious and motion-heavy year-and-a-half-long discovery practice.[122] During this time, the Plaintiff also requested leave to file a counterclaim against Intervenor-Defendant Real Time Data and moved to amend his complaint a second time.[123] On February 26, 2018, I held a hearing on all outstanding motions.[124] I noted at the hearing that the Plaintiff's requested second amended complaint was "a completely new complaint."[125] The Plaintiff agreed, but felt that "so many things have materially changed that [he] kind of thought a redo was in order."[126] I denied the Plaintiff's motion to amend the complaint.[127] At that same hearing, I directed the

---

[121] *Id.* at 11:15–16 ("[W]hat remains in this case is the value of [Plaintiff's] interest at the time of the merger.").

[122] I will not recount the discovery motions in full, which are legion. *See generally* D.I. 127–97.

[123] Pl.'s Request for Mot. for Leave to File a Sec. Am. Compl., D.I. 147; Countercl. Against Intervenor Def. Real Time Data Services, LLC, D.I. 156 ("Pl.'s Counterclaim"). The counterclaim against Real Time Data contained seven counts: (1) Breach of Contract; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Defamation; (4) Fraud; (5) Constructive Trust; (6) Promissory Estoppel; and (7) Accounting from Data Services. Pl.'s Counterclaim. The Plaintiff also filed a "Petition for Post-Merger Appraisal" requesting the Court order a third-party fairness opinion. Petition for Post-Merger Appraisal, D.I. 167.

[124] Feb. 26, 2018 Ruling.

[125] *Id.* at 5:8–13.

[126] *Id.* at 5:14–16.

[127] *Id.* at 26:5–27:7.

22

parties to engage valuation experts so that the remaining claim could proceed to trial.[128]

By the fall of 2018, the parties were proceeding toward trial. The filing of expert reports led to further contentious and motion-heavy discovery disputes.[129] Eventually, the Defendants filed a Motion for Summary Judgment on May 15, 2019.[130] I informed the parties that I would resolve the Defendants' Motion for Summary Judgment post-trial, after establishing an evidentiary record.[131] I held a one-day trial on June 26, 2019. After post-trial briefing completed—with some delays due to the Plaintiff's request to reopen the discovery phase of the litigation— I considered this matter submitted on December 20, 2019.[132]

My decision follows.

## II. ANALYSIS

This case concerns the Plaintiff's claim for a breach of fiduciary duty against the Defendants for the loss of his economic interest in Real Time Data, a claim for which the Defendants concede wrongdoing.[133] Therefore, this case entails two

---

[128] *Id.* at 23:16–25:18.

[129] *See generally* D.I. 206–37.

[130] Defs.' Mot. for Summ. J. and to Strike Pl.'s Proposed Expert Report, D.I. 244.

[131] Ltr. to Litigants, D.I. 252.

[132] Ltr. to Counsel and Mr. Zachman, D.I. 273.

[133] *See* Trial Tr. 59:14–17 (Chhabra) (testifying that "on flashback, I very deeply apologize, we should have gone by the Delaware rules. I was actually not so much aware of it. And we should have determined the fair value."); *see also* Defs. Real Time Cloud Services, LLC, Sangeeta

questions. The first is how much Real Time Data was worth when Chhabra merged Zachman out, without fair compensation, in 2012.[134] The second is whether that value must be offset by Real Time Data's counterclaims.

Before reaching these claims, however, I address two predicate matters. The Defendants filed motions that I preserved ruling on until after trial: (1) a motion *in limine* to exclude the Plaintiff's valuation report, and (2) a motion for sanctions related to the Plaintiff's discovery practice.[135] In the course of addressing these issues, I also address concerns the Plaintiff raised post-trial, including arguments about wrongful termination and his purported need for further discovery.

### A. The Defendants' Daubert Motion to Exclude the Plaintiff's Expert Valuation Report

The Defendants seek to exclude the Thomas Report.[136] They argue that the Thomas Report is inadmissible under Delaware Rule of Evidence 703.[137] Under Rule 703, an expert's report must be based on "facts or data in the case that the expert

---

Chhabra, CBS Accounting Pvt. Ltd. & Real Time Data Services, LLC's Opening Post-Trial Br., D.I. 259 ("Defs.' Opening Post-Trial Br."), at 19 ("[T]he Seitz Report . . . should be accepted as stating fair value of [Real Time Data] on the merger date was $265,000.").

[134] *See* July 28, 2016 Ruling, at 11:15–16 ("[W]hat remains in this case is the value of [Zachman's] interest at the time of the merger.").

[135] The Defendants also moved for Summary Judgment on all claims and counterclaims. Defs.' Mot. for Summ. J. and to Strike Pl.'s Proposed Expert Report, D.I. 244. Given the existence of a full trial record, that motion is moot, except as it regards the Defendant's evidentiary motion, addressed below.

[136] *See* Defs.' Opening Br. in Support of Their Mot. for Summ. J. and Their Daubert Mot., D.I. 244, ("Defs.' Opening Summ. J. Br."), at 11–15.

[137] D.R.E. 703.

has been made aware of."[138]  Where "the expert's opinion is not based upon an understanding of the fundamental facts of the case," it should be excluded.[139] Excluding such evidence avoids a "two-layered reliability analysis" of both the underlying facts *and* the results based on those facts.[140]

The Defendants argue that the Thomas Report is based on financial information that is, in turn, based on Zachman's subjective conclusions regarding the Company's expenses and income.[141]  In addition, the Thomas Report values the Company as of May 2012, six months prior to the Merger.[142]  Therefore, the Defendants conclude, its factual basis is speculative.  However, I find that these factual issues go to the credibility of the experts and should be evaluated in light of their testimony and the evidence put forward at trial.  In other words, rather than a misunderstanding of the fundamental facts, the Thomas Report illustrates a disagreement about the fundamental facts, one that requires resolution.  As such, excluding the evidence is improper in this context; instead, I evaluate each experts' credibility considering the factual record developed at trial.  Therefore, I deny the Defendants' Motion to Strike Plaintiff's Expert Report.

---

[138] *Id.*

[139] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010).

[140] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1270 (Del. 2013).

[141] Defs.' Opening Summ. J. Br., at 13–15.

[142] *Id.* at 14.

*B. Discovery Issues*

As noted in the procedural history, a contentious discovery process lengthened every segment of this nearly six-year-old case.[143] On two separate occasions, discussed below, I ordered Zachman to produce discovery, and he either refused or his responses were inadequate. One of these occasions warranted a presumption that the concealed evidence (his full tax returns) supported the Defendants' position. For his part, Zachman contends that he requires an extensive review of the bank records of Real Time Data's third-party service providers so that he can verify Real Time Data's financial records, a contention he takes up even after trial. I address both issues below.

### 1. The Plaintiff's Discovery Abuse

The Defendants filed a motion for sanctions against Zachman for his discovery abuses.[144] As relief, they request that I bar Zachman's expert from testifying.[145]

Part of the Defendants' discovery requests included Zachman's full income tax returns, which would show how much income Zachman reported from Real Time

---

[143] The case has seen eight motions to compel, four from each side. *See* D.I. 28, D.I. 127, D.I. 145, D.I. 153 (Plaintiff's motions to compel); D.I. 144, D.I. 162, D.I. 182, D.I. 209 (Defendants' motions to compel).

[144] Defs.' Mot. *in Limine* to Bar Testimony Because of Pl.'s Disc. Abuse, D.I. 254 ("Defs.' Mot. *in Limine*").

[145] *Id.*

Data. Because Zachman had the right to half the Company's net income, this number would indicate the Company's total net income. Zachman refused to produce those in full because he did not believe they were "relevant."[146] On March 5, 2019, I ruled that Zachman's failure to produce his full tax returns warranted a presumption that they would support the Defendants' position.[147] In other words, Zachman's refusal to produce this discovery estops him from establishing that Real Time Data's income is higher than its financial statements show. As of trial, Zachman had still not produced the portion of his tax returns showing the amount of income he reported as coming from Real Time Data.[148]

The Defendants also requested that Zachman produce his communications with Real Time Data customers from his new company, Cloudvara. Zachman testified that Real Time Data customers in fact left the Company to come to Cloudvara.[149] But he refused to produce communications from Cloudvara other than sixteen emails dated before June 1, 2012, explaining in his response that he was

---

[146] March 5, 2019 Ruling, at 24:15–25:12.

[147] *Id.* at 35:19–36:3; *Lucas v. Chistiana Skating Center, Ltd.*, 722 A.2d 1247, 1248 (Del. Super. 1998) ("Courts in Delaware recognize the general rule that 'where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.'" (quoting *Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. Super. 1980))).

[148] Trial Tr. 202:3–205:3 (Zachman).

[149] *Id.* at 228:4–9 (Zachman).

attaching "all contacts for Cloudvara that could possibly be relevant."[150] I found this production inadequate.[151] On March 5, 2019, I ordered Zachman to produce—within ten days—all documents showing his communications with Real Time Data customers on behalf of Cloudvara.[152] He did not do so. At trial, never having sought a protective order, he continued to maintain that communications after June 1, 2012 were irrelevant to Real Time Data's counterclaims.[153]

Similar to my ruling on Zachman's refusal to produce his full tax returns, his refusal to produce communications after June 1, 2012 warrants a presumption in favor of the Defendants and Intervenor-Defendant that these communications would show that from June 1, 2012 through the Merger, Zachman continued to successfully solicit Real Time Data customers to join him at his competing company, Cloudvara.[154]

---

[150] *Id.* at 229:24–230:7 (Zachman).

[151] March 5, 2019 Ruling, at 35:15–18.

[152] *Id.* ("It's clear to me that you control the Cloudvara documents. You need to respond to those [discovery requests].").

[153] Trial Tr. 228:10–231:6 (Zachman).

[154] *See Lucas v. Chistiana Skating Center, Ltd.*, 722 A.2d 1247, 1248 (Del. Super. 1998) ("Courts in Delaware recognize the general rule that 'where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.'" (quoting *Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. Super. 1980))).

I find these factual presumptions sufficiently resolve the issues of the Plaintiff's failure to produce discovery, and I therefore deny the Defendants' Motion *in Limine* to Bar Testimony Because of Plaintiff's Discovery Abuse.

### 2. The Plaintiff's Discovery Demands

In contrast to Zachman's obstinacy in refusing to produce discovery, his demands for it are far-ranging. Even after trial, rather than filing his answering post-trial brief, he filed a "Motion to Reconsider," purportedly under Chancery Court Rule 60, requesting that the Court reopen discovery and grant his motions to compel.[155] I denied this motion and ordered the Plaintiff to complete post-trial briefing.[156] Because the Plaintiff continues to address the issue in his post-trial briefing, and because it is relevant to the experts' credibility, I address it here.

To facilitate a valuation, Real Time Data produced its financial records to Zachman in the form of QuickBooks files. Zachman, however, believes Real Time Data is inflating its expenses, and he therefore sought to compel the bank records of the Indian companies that provide services to Real Time Data so that he can conduct his own reconciliation of the Company's expenses. In other words, he wishes to conduct a detailed financial audit of Real Time Data as a part of the litigation. At a hearing on February 26, 2018, I recognized that satisfaction of Zachman's discovery

---

[155] Mot. to Reconsider and to Postpone Final Post-Trial Replies by Pl. until the Matter is Resolved, D.I. 261.

[156] Order dated October 10, 2019, D.I. 266.

requests—full review of six years of third-party bank records—would be "incredibly burdensome."[157] Nonetheless, I ordered Zachman to secure an expert and have the expert inform me whether the records were necessary to conduct a valuation.[158] Three months later, Brian Mendez, CPA, submitted an affidavit stating that the discrepancies between the numbers that Zachman provided to him and the numbers the Company provided required third-party bank records to reconcile.[159] In other words, Mendez certified that he would need the third-party records to verify whether Zachman's suspicions were correct, or whether it was Zachman himself who was providing inaccurate financials.

In an attempt to compromise, the Defendants produced a sample month— December 2011—of all third-party bank records, reconciling in detail Real Time Data's expenses against these bank records.[160] At argument on March 5, 2019, I addressed this discovery dispute.[161] I informed Zachman that I considered the Defendants' production sufficient for his purposes but that I would order further records if his expert filed a rebuttal report explaining why the absence of such

---

[157] February 26, 2018 Ruling, at 27:17–28:6.

[158] *Id.* at 27:17–28:6.

[159] Aff. Valuation Request of Brian Mendez, CPA, D.I. 206.

[160] *See* Unsworn Foreign Declaration of Sangeeta Chhabra Supplementing Defs.' Answer to Pl.'s Mot. to Compel Disc., D.I. 227–28.

[161] March 5, 2019 Ruling.

records supported a presumption of unreliability.[162] Zachman's expert, Thomas, filed his rebuttal report on March 27, 2019.[163] In his rebuttal, Thomas stated essentially the same thing as Mendez: to determine if *Zachman's* numbers were correct, he needed third-party bank records.[164] Neither Mendez nor Thomas, however, offered any reason to support the contention that the Company's financial statements were inaccurate.

Zachman has continued to argue post-trial, however, that he needs the third-party records. In reviewing the sample month of third-party bank records, he claims to have found "several fraudulent entries."[165] However, he only offers "one such example."[166] He notes that Real Time Data entered "Rent paid for Office" as a 30,000 rupee ($595.71) expense, and lists a single check number.[167] The third-party, Real Time Data SPL, deposited a check bearing the same number for 15,000 rupees ($297.86).[168] From this entry, Zachman infers that Chhabra was orchestrating a

---

[162] *Id.* at 40:5–13.

[163] Letter from Pl., Ex. A, Expert Evaluation Rebuttal Reply of Derek Thomas, D.I. 242 ("Thomas Rebuttal").

[164] *Id.* at 2.

[165] Pl.'s Argument in Opp'n to Defs.' Summ. J. and Daubert Mot., D.I. 255 ("Pl.'s Opp'n to Summ. J."), at 8.

[166] *Id.* at 8.

[167] *Id.* at 8, Ex. M.

[168] *Id.*

31

100% markup to hide income.[169]  However, the expenses Real Time Data provided list "Rent paid for Office" as comprising *two* deposits on the associated bank statement from Real Time Data SPL.[170]  Correspondingly, Real Time Data SPL's bank statement shows two 15,000 rupee checks deposited.[171]  In other words, Zachman claimed to have found a single inaccurate entry of less than $300, but when bringing it to the Court, he failed to include the pages of the record that show the entry is not, in fact, inaccurate.

In short, while Zachman is convinced Chhabra is falsifying the financial records to hide income, he has not offered a credible basis to support this belief.  A detailed six-year audit of the Company's financial records is not warranted by his suspicions.  I found Chhabra's testimony regarding Real Time Data's expenses to be credible.  By contrast, Zachman's testimony was largely conclusory.[172]  The evidence shows that he had access to Real Time Data's financial records during the

---

[169] *Id.* at 8.

[170] DX 8, Ex. C, at 1.

[171] DX 8, Ex. C, Annexure 1, at 4, 6.  The first check has a different check number than the number listed on the expense sheet.  The expense sheet, however, identifies total rent paid for the month and also identifies the two deposits that make up this total amount.  *See* DX 8, Ex. C, at 1.

[172] *E.g.* Trial Tr. 154:1–4 (Zachman) (testifying "I don't know specifically what the answer is [regarding "sensitive accounting activities" in the Company's QuickBooks], but it must be something that they want to hide; that they want other people not to see.  Thus, it becomes sensitive."); 180:7–182:8 (Zachman) (comparing Chhabra's business practices to Hitler's decision to engage the Eastern Front in World War II).

relevant years.[173] He corresponded with the accounting personnel at the Company regarding his inquiries.[174] He corresponded with Real Time Data SPL employees and knew about that company's existence.[175] Despite Zachman's testimony, it appears that he was aware of all of Real Time Data's PayPal accounts and he was aware of the funds moving between those accounts.[176] Again, I note that Thomas,

---

[173] *See* DX 7 (emails from 2007 through 2012 between Zachman and accounting personnel at Real Time Data); Trial Tr. 27:5–21 (Chhabra).

[174] DX 7, at 23, 31, 64; Trial Tr. 28:13–32:3 (Chhabra). The page numbers for DX 7 are handwritten.

[175] Trial Tr. 196:24–198:17 (Zachman); DX 31 (emails between Zachman and Real Time Data SPL employees).

[176] Zachman remains fixated on the Company's PayPal accounts and appears to consider this issue part of his breach of fiduciary duty claim. In his post-trial briefing, he writes, "[a]t the heart of this dispute, is Chhabra's PayPal merchant account." Post-Trial Br., D.I. 271 ("Pl.'s Post-Trial Br."), at 24. Zachman mentioned PayPal in the factual allegations in his Amended Complaint. Am. Compl., ¶¶ 16–18. However, he did not include issues with PayPal in his Breach of Fiduciary Duty Count, which only addresses the Merger. *See* Am. Compl., ¶¶ 48–55. Even had he included PayPal issues in his breach of fiduciary duty claim, Zachman's evidence and testimony on this subject is inscrutable and often contradictory. It is clear that at least two PayPal accounts existed, and that one was in Zachman's name, while the other was in Chhabra's name. *See* DX 6, at 1 (PayPal account in Zachman's name); PX F, at 1 (PayPal account in Chhabra's name). Chhabra's account appears to have been used to move funds to India so that she could pay business expenses and take her draws. *See* Trial Tr. 89:5–10 (Chhabra). Zachman testified that he did not know that Chhabra's PayPal account existed until February 2012, and that this was the first time he knew any money was going to India. Trial Tr. 150:18–151:1 (Zachman). He also testified that he was involved in disputes with Chhabra over PayPal funds going to India as early at 2009, when she testified her PayPal account was created. Trial Tr. 161:8–167:5 (Zachman). Zachman testified that as of late 2009, he was angry with Chhabra because she would "take money to India" when the Company needed it to pay vendors. Trial Tr. 164:22–165:3 (Zachman). Similarly, he stated that money would be in his PayPal account, then he would find "they had already withdrawn the funds and they were off to India." Trial Tr. 165:22–166:5 (Zachman). In his post-trial briefing, Zachman continued to provide contradictory dates. He wrote that a PayPal 1099 form—which he testified alerted him to Chhabra's PayPal account—"came in in February 2012 . . . and the full PayPal records were not discovered until [I] received them in January 2014 from PayPal. Prior to January 2014, the only PayPal records [I] had access to were provided to [me] by Defendants in May 201[1]." Pl.'s Post-Trial Br., at 35. The exhibit referenced—Zachman submitted further exhibits with his post-trial brief—shows these PayPal records are from May 2011. Pl.'s Post-Trial

Zachman's expert, has failed to substantiate Zachman's allegations of false Real Time Data financials.

Considering the above, my pre-and-post-trial rulings stand denying Zachman's motions to compel additional discovery from the third-party Indian companies that would allow him to conduct a financial audit of Real Time Data. Zachman has not put forward evidence that creates doubt about the Company's financial records sufficient to warrant reopening the record. Moreover, as discussed above, Zachman's failure to produce his tax returns in full warranted an evidentiary presumption in favor of the accuracy of Real Time Data's QuickBooks.[177]

*C. The Plaintiff's Claim for Breach of Fiduciary Duty*

Delaware's common law fiduciary duties apply to mangers and managing members of Delaware LLCs.[178] An LLC may eliminate those common law duties

---

Br., Ex. D. The Defendants' counsel examined Zachman at trial regarding emails showing that he helped Chhabra set up a PayPal account in 2009, and that he in fact received security cards for this account. Trial Tr. 208:2–210:22 (Zachman). First, Zachman testified that the "PayPal virtual terminal" he helped set up was not a bank account and so these emails did not relate to Chhabra's account, though he did not produce evidence to support this. Trial Tr. 209:10–210:9 (Zachman). He then testified regarding the account, "I knew it was a PayPal account, but they weren't using it to pay expenses . . . they were taking all the money out on the first of the month to PayPal, there was no money left to pay [vendors]." Trial Tr. 210:15–22 (Zachman). Given this collection of contradictory testimony and lack of evidence, it is impossible for me to credit Zachman's allegation that Chhabra stole his identity to create a secret PayPal account that she used to siphon off money from the Company. See Am. Compl., ¶¶ 16–18; Pl.'s Post-Trial Br., at 24–25.

[177] March 5, 2019 Argument, at 35:19–36:3 ("With respect to the tax records, they should have been produced . . . I think the easiest thing to do with those is just to assume that they would support [the Defendants'] proposition, which is that Mr. Zachman certified the Real Time accounting through his verification to the federal government as to the sums he's received.").

[178] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (citing 6 *Del. C.* § 18-1104; 6 *Del. C.* § 18-1101(c)). I note that Defendant Real Time Cloud was a separate entity unrelated to Real

in its operating agreement, provided that it does so clearly.[179]  By contrast, LLCs "may not eliminate the contractual covenant of good faith and fair dealing."[180]  Real Time Data's Operating Agreement does not eliminate fiduciary duties, and so by default, the Defendants owed fiduciary duties and obligations of good faith and fair dealing to Zachman.[181]  Zachman, although he continues to argue a wide array of wrongs, essentially claims the Defendants breached that fiduciary duty when they eliminated his economic interest through the Merger in 2012.[182]

---

Time Data, and the Plaintiff has not raised any convincing argument that Real Time Cloud would owe fiduciary duties.  The Defendants, however, do not attempt to distinguish Real Time Cloud regarding liability for the breach of fiduciary duty claim.

[179] 6 *Del. C.* § 18–1101(e); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) (requiring elimination of common law fiduciary duties by an LLC to be "plain and unambiguous").

[180] 6 *Del. C.* § 18-1101.

[181] *See* Operating Agreement.

[182] This Court may exercise discretionary leniency toward *pro se* litigants to ensure their claims do not fail on technicalities.  *See Aziz v. Tsappas*, 2019 WL 6724426, at *1 (Del. Ch. Nov. 1, 2019); *Durham v. Grapetree LLC*, 2014 WL 1980335, at *5 (Del. Ch. May 16, 2014).  Zachman spends the majority of his post-trial briefing arguing that 10 *Del. C.* § 18-304 is void under the Takings clause of the U.S. Constitution and that Chhabra's attempt to use his personal bankruptcy as grounds to terminate his employment at Real Time Data was anathema to our nation's founding document.  Pl.'s Post-Trial Br., at 1–24.  Zachman also argues his termination was illegal under federal statute.  Pl.'s Post-Trial Br., at 30–31.  I ruled on the issue of Zachman's termination at summary judgment several years ago, holding that it occurred as a valid operation of law and that the Defendants did not consent to maintaining Zachman as an LLC member.  *See* July 28, 2016 Ruling, at 5:18–7:10.  Despite the leniency granted to *pro se* litigants, this issue has been ruled on; it is the law of this case.  Having ruled on the validity of his termination, I will not reconsider that issue here.

### 1. Liability

Under 6 *Del. C.* § 18-304, "[a] person ceases to be a member of a limited liability company," if that person "[f]iles a voluntary petition in bankruptcy."[183] Accordingly, in May 2012, Chhabra expressed that Zachman's membership in Real Time Data, and his manager status, had ended by operation of Delaware law due to his personal bankruptcy in 2010.[184] At that point, under *Milford Power Co., LLC v. PDC Milford Power, LLC*,[185] Zachman became an "assignee" with economic rights but no membership rights.[186] Acting on the managerial control this termination gave her, on October 29, 2012, Chhabra merged Real Time Data with RTDS LLC, converting Zachman's interests as an assignee into cash value.[187] To assign a value, she chose the number Zachman assigned to his interest in his 2010 bankruptcy petition: $3,487.50.[188] Alleging that Zachman's post-termination actions had "caused financial harm" to Real Time Data, Chhabra applied the value of Zachman's interest against what she alleged he owed the Company and paid him $0.[189]

---

[183] 6 *Del. C.* § 18-304.

[184] *See* November 25, 2012 Letter.

[185] 866 A.2d 738 (Del. Ch. 2004).

[186] *Id.* at 762 ("[6 *Del. C.*] § 18-304 means that a member who files for bankruptcy still ceases to be a member, but becomes an assignee with the economic rights specified in [6 Del. C.] § 18–702(b).").

[187] *See* November 25, 2012 Letter.

[188] *Id.*

[189] *Id.*

The Defendants do not dispute this narrative. At trial, Chhabra testified that "during that time period [i.e. the Merger] . . . we had used the value which [Zachman] had put for the company in Bankruptcy filed in 2010. But today, of course, we have requested Mr. Paul Seitz to do the fair value of the company."[190] Chhabra also expressly conceded wrongdoing, testifying, "we should have gone by the Delaware rules . . . we should have determined the fair value."[191]

I agree with Chhabra's concession. As a manager of the LLC and controller of the LLC's other member, CBS Accounting, Chhabra owed fiduciary duties as well as the obligation of good faith and fair dealing to Zachman. Her selection of the Merger value was a pretextual opportunity to avoid paying Zachman anything for his interest in the Company he had co-founded. The proper way to remedy this breach, I find, is to determine the fair value of Zachman's interest, and award him damages.

2. Damages

The parties submitted expert reports, and both experts testified at trial as to the fair value of Zachman's interest. To reach their numbers, the experts valued Zachman's interest at different dates, based the Company's income on different

---

[190] Trial Tr. 94:20–24 (Chhabra).

[191] *Id.* at 59:14–17 (Chhabra).

financial records, and employed different valuation approaches.[192]  The Defendants'

expert, Paul Seitz, valued Zachman's interest in Real Time Data at $132,500, while

the Plaintiff's expert, Thomas, valued Zachman's interest at over twelve times this

amount, $1,682,000.[193]

> ### a. The Relevant Date for the Valuation of Zachman's Interest is the Merger in October 2012

Real Time Data terminated Zachman as manager in May 2012.[194]  Chhabra

eliminated his economic interest in the Company through the Merger in October

2012.[195]  Zachman argues that the valuation date ought to be his termination date in

May, and his expert, Thomas, uses this earlier date in calculating the value of the

Company.[196]  I find the proper date of the valuation is October 2012 for two reasons.

First, October 2012 is when Chhabra eliminated Zachman's interest without

proper compensation, and thus Zachman's claim arose at that time.  Zachman's

argument that his interest should be valued as of May 2012 is based on the contention

that his termination was wrongful.[197]  I have already found, however, that Zachman's

---

[192] *See* Seitz Report; Thomas Report.

[193] Seitz Report, at 15; Thomas Report, at 1.

[194] DX 15 (Zachman emailing Real Time Data customers noting his date of departure as May 16, 2012); Trial Tr. 48:8–11 (Chhabra).

[195] As noted, the Amended Complaint states the date of the Merger was October 29, 2012.  Am. Compl., ¶ 4.  Seitz identified the Merger date as October 28, 2012.  Trial Tr. 118:6–10 (Seitz).

[196] Pl.'s Post-Trial Br., at 36–37; Thomas Report, at 1.

[197] *See* Pl. Post-Trial Br., at 30–31 (arguing that his termination as manager was unlawful under 11 U.S.C. § 525).

termination was merely the Defendants' acknowledgement of his removal by operation of law under 6 *Del. C.* § 18-304 at the time of his 2010 bankruptcy.[198] The interest held by Zachman thereafter was eliminated in October of 2012; its value at that time is the measure of his damages.[199]

> b. The Value of Zachman's Interest in Real Time Data as of October 2012 is $173,000

When evaluating parties' expert opinions, "[t]he Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation."[200] I find the Seitz Report, along with Seitz' trial testimony, more reliable, and so I utilize it, with adjustments, to determine the value of Zachman's interest. Two factors lead me to this conclusion.

---

[198] July 28, 2016 Ruling, at 6:9–14.

[199] I note that it would be inequitable to value Zachman's shares at the earlier date. After his termination in May 2012, Zachman engaged in a campaign to prevent Real Time Data from operating in the United States. *See* DX 16-A through H. He also started a competing company and, by his own admission, successfully solicited Real Time Data's customers. Trial Tr. 228:4–9 (Zachman). Having eroded the value of Real Time Data for six months leading up to the Merger, he cannot argue that this Court of equity should ignore the downturn in its financial performance.

[200] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *20 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017).

First, the Plaintiff's expert, Thomas, valued Zachman's interest as of May 2012.[201] Seitz, by contrast, used the Merger date in October 2012, which I have found above to be the appropriate date.[202]

Second, the experts based their valuations on different financial records. Seitz used financial information from the QuickBooks supplied by Real Time Data.[203] Thomas used financial information from the QuickBooks he received from an accounting firm that Zachman engaged to "recreate" Real Time Data's financial statements "from scratch" based on "source documents" that were provided by Zachman.[204] Thomas testified that he discussed the source documents with the accounting firm, but that he did not reconcile the numbers to the Company's financial information.[205]

Zachman simply had no credible basis for the financial figures he supplied to Thomas, and Thomas' use of those figures led to two problems highlighted in Seitz' rebuttal and at trial. Zachman, due to his unwillingness to use the Company's QuickBooks, simply guessed at the expenses related to Real Time Data's operations

---

[201] Thomas Report, at 1.

[202] Seitz Report, at 1.

[203] *Id.* at 4–5.

[204] Thomas Report, at 2.

[205] Trial Tr. 256:24–257:12 (Thomas).

in India.[206]  Based on Chhabra's and Seitz' credible trial testimony and Real Time Data's financials, Zachman severely underestimated these expenses.  For example, Zachman would not agree how many people Real Time Data employed.  To "prove" his estimates of personnel expenses in India, he offered a photograph he had apparently taken on a trip to the Company showing a room with six people in it and two empty chairs.[207]  Given that the Company operated in two shifts, he argued this photo demonstrated the Company employed at most fifteen to eighteen people.[208]  Seitz testified that based on the Company's records—which trial testimony and a review of the evidence gave no reason to suspect—Thomas underestimated expenses from 2007 to 2011 by approximately $682,000.[209]

The second problem with Thomas' reliance on Zachman's numbers is that Zachman inflated Real Time Data's income figures.  On cross-examination, Zachman could not explain the fact that the income he alleged Real Time Data

---

[206] *Id.* at 238:6–239:4 (Thomas).  I have already discussed at length why I found Zachman's suspicions unfounded and denied him the opportunity to conduct what amounted to a financial audit through discovery.

[207] Zachman included this photograph with his trial exhibits; it appears from a hand-written annotation in the corner to be PX Z.

[208] Trial Tr. 184:9–185:7 (Zachman) (testifying "[t]he reason I know [the number of employees is] a fictitious number is because I've been to India.  And that's a picture of the office.  That office is approximately 12 feet wide by about 20 feet, 25 feet deep.  Holds about six to seven engineers . . . [s]o at any given time, there was maybe six people or seven people in that room and rotating through there was at most 15 to 18 at any -- on the payroll at any given time.  So [Defendants'] number is false.").

[209] *Id.* at 112:16–115:19 (Seitz).

generated was *significantly* higher than the income he reported on his personal tax returns.[210]  For example, based on the numbers that Zachman provided to the accounting firm, Thomas found that Real Time Data had a net income of $312,436.13 in 2010 and $422,171.98 in 2011.[211]  In 2010, Zachman reported a joint income, together with his wife, of $53,000.[212]  He stated the discrepancy was due to income he had earned but had not yet moved to his personal bank accounts, though he offered no evidence to support this statement.[213]  Moreover, I found that Zachman's refusal of this Court's order to produce his complete personal tax returns during discovery created a presumption in favor of Real Time Data's income figures.[214]  He cannot now establish that the Company's income was three to four times what he reported to the federal government.

I found both Chhabra's and Seitz' testimony regarding Real Time Data's finances credible, and I therefore find the numbers in the Seitz Report to be the most reliable indication of the Company's value.  However, I found Seitz' estimates

---

[210] *Id.* at 206:6–207:7 (Zachman).  As I noted above, although Zachman produced portions of his tax returns, he refused to produce the exhibits that showed how much income he reported from Real Time Data. *See supra*, Section II.B.1; *see also* March 5, 2019 Ruling, at 24:15–25:12.

[211] Thomas Report, at Schedule 7.

[212] Trial Tr. 202:3–204:12 (Zachman).  As noted earlier, Zachman never produced his full tax returns, and so the Defendants were unable to identify the amount he reported to the government as income from Real Time Data.

[213] *Id.* at 206:20–207:7 (Zachman).

[214] March 5, 2019 Ruling, at 35:19–36:3.

regarding Real Time Data's growth, given its early year-over-year expansion, unduly conservative. Therefore, to find fair value, I utilize the numbers and income capitalization model provided in the Seitz Report, but I adjust the long-term company growth rate from Seitz' prediction of 2% to Thomas' higher prediction of 5%, to account for the Company's early-years hyper-growth. Applying a 5% long-term growth rate to Seitz' model produces an equity value for Real Time Data at the date of the Merger of $346,000. Zachman's fifty-percent economic interest is worth $173,000.

### D. Real Time Data's Counterclaims[215]

Real Time Data, as Intervenor-Defendant, filed counterclaims against Zachman for conversion, violation of the Deceptive Trade Secret Act, and tortious interference with contract.[216] The Defendants seek to have any award from Real Time Data's counterclaims offset their liability owed for the fair value of Zachman's interest resulting from the breach of fiduciary duty claim.[217] I find, however, that

---

[215] Real Time Data filed its counterclaims on September 8, 2015. Countercl. by Intervenor-Def. Real Time Data Services, LLC, D.I. 93. On October 19, 2016, Zachman requested leave to file a "Supplemental Answer & Counterclaim Against Intervener Defendant Real Time Data Services, Inc." D.I. 142. Zachman sought to bring seven counts against Real Time Data: (1) Breach of Contract, (2) Breach of Implied Covenant of Good Faith and Fair Dealing, (3) Defamation; (4) Fraud; (5) Constructive Trust, (6) Promissory Estoppel, and (7) Accounting from Data Services. *Id.* I consider Zachman's request for leave to file this counterclaim denied under my ruling of February 26, 2018, where I denied his request for leave to file a second amended complaint, for the same reasons stated in that ruling. *See* February 26, 2018 Ruling, at 25:19–27:7.

[216] Countercl. by Intervenor-Def. Real Time Data Services, LLC, D.I. 93.

[217] The Defendants, in their briefing, often fail to distinguish between the Defendants and the Intervenor-Defendant, Real Time Data. *E.g.* Def. Real Time Cloud Services, LLC, Sangeeta

the Intervenor-Defendant has failed to establish an entitlement to damages or an offset.

### 1. Conversion

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[218] Real Time Data argues that Zachman is liable for conversion because he overdrew on the Company's bank accounts over several years and because he withheld revenue deposits in his secret U.S. Bank account, using the funds to pay for personal items.

For this counterclaim, the burden is on the Intervenor-Defendant to prove that Zachman's draws and withholding of funds amounted to conversion. As proof of the overdraws, the Intervenor-Defendant submitted a one-page chart into evidence showing a summary of how much it calculates Zachman overdrew the Company's bank accounts from fiscal years 2005 through 2013.[219] Chhabra testified she created this chart from bank statements with the help of an accountant.[220] The number is

---

Chhabra, CBS Accounting Pvt. Ltd. and Real Time Data Services, LLC's Reply Post-Trial Br., D.I. 272, at 1 (naming Real Time Data simply as a "Defendant"), 5 (stating that "Zachman has failed to rebut the *prima facie* showing that supports Defendants' claim against him."). I have attempted to distinguish the Defendants from the Intervenor-Defendant throughout this Opinion for the sake of clarity, although in some situations the distinction is immaterial.

[218] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

[219] DX 9, at 1.

[220] Trial Tr. 39:17–41:20 (Chhabra).

$48,720.[221] Regarding the U.S. Bank account Zachman opened, Chhabra followed the same approach, compiling expenditures and withdrawals into a one-page chart with the aid of bank statements and an accountant and reaching a final number labeled "Unexplained Withdrawal" of $63,213.20.[222]

These summary charts do not cite to or provide the bank statements or financial records from which the data is compiled.[223] The charts add together the categories "Summary of Money excessively withdrawn" and "Unexplained Withdrawal" to create "Total Money recoverable from Mr. Zachman."[224] This falls short of Real Time Data's burden of proof on this claim. The evidence offered does not permit the Court to weigh whether these withdrawals and withholdings were tortious; instead, Real Time Data essentially asks me to assume wrongdoing and rely on its calculations, for which it provides only cumulative summaries. Zachman, too, has explanations regarding the amounts of his withdrawals and withholdings.[225]

---

[221] DX 9, at 1.

[222] DX 9, at 2; Trial Tr. 44:23–46:1 (Chhabra).

[223] The Defendants provided some of the bank statements for the U.S. Bank account in DX 12, sample bank statements from Wells Fargo and Wachovia in DX 2, and a sample month of account activity in the Wells Fargo account in DX 25. These sample bank statements were included to demonstrate Zachman's access to the accounts and to show the flow of money within the Company. Trial Tr. 15:5–19:4 (Chhabra). The Defendants argue these sample bank statements support Chhabra's testimony at trial that she was able to trace funds and make calculations as to the amount tortuously converted, as summarized in DX 9. Defs.' Opening Post-Trial Br., at 8–9. The summary charts in DX 9, as noted, do not reference any underlying bank statements or financial records.

[224] DX 9, at 1–2.

[225] Trial Tr. 218:2–219:15 (Zachman).

Given the summary nature of Real Time Data's evidence, I have no way to evaluate credibility or compare the validity of the competing allegations, and so I cannot find that it is more likely than not that Zachman's withdrawals or retention of funds constituted conversion.

### 2. Tortious Interference with Contract[226]

Tortious interference with contract requires showing "(1) a valid contract, (2) about which the defendants have knowledge, (3) an intentional act by defendants that is a significant factor in causing the breach of the [contract], (4) done without justification, and (5) which causes injury," that is, cognizable damages.[227] The Intervenor-Defendant argues that I should award damages because Zachman tortuously interfered with its contracts following his termination from the Company.

The Intervenor-Defendant argues as follows, based on the evidence at trial: Real Time Data had valid contractual relationships with its customers; Zachman knew about those contracts because he helped obtain them through his marketing role at the Company; after his termination, he intentionally emailed Real Time Data customers and asked them to end their contractual relationship with Real Time Data

---

[226] As noted, Real Time Data also filed a counterclaim for violation of the Deceptive Trade Secret Act. Because the Intervenor-Defendant did not address this counterclaim in post-trial briefing, I consider it waived.

[227] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *9 (Del. Ch. Jan. 29, 2010).

and move to Cloudvara.[228]  Further, Real Time Data argues Zachman's interference was without justification: he used its customer list—which it claims is a trade secret; he attempted to win the customers, at least in part, by disparaging the Company, insinuating that conducting business with an India-based company was unduly risky; and he otherwise engaged in wrongful behavior to stymie its business.[229]  Finally, Real Time Data argues it was damaged, witnessing a spike in customer loss that, due to Zachman's discovery abuse, I should presume resulted from Zachman's efforts at Cloudvara.[230]

I note that the Intervenor-Defendant failed to allege that Zachman caused a breach of any particular Real Time Data contract.  The counterclaim appears to be a mispled claim for tortious interference with business relationships.[231]  In any event, I find that the Intervenor-Defendant's claim founders on the shoal of justification. Real Time Data argues that it was damaged because Zachman poached its customers. Once Zachman was terminated, he was free to compete; the parties could have, but did not, have a non-compete contract.  Telling consumers that Real Time Data no

---

[228] Defs.' Opening Post-Trial Br., at 22–25.

[229] *Id.* at 26–27; DX 15 (June 27, 2012 email suggesting Real Time Data had unsafe business risks); Trial Tr. 57:23–58:8 (Chhabra).  DX 15 does not include page numbers.

[230] Defs.' Opening Post-Trial Br., at 27–29.

[231] For tortious interference with contract, Delaware law requires "an intentional act by defendants that is a significant factor in causing the breach of the [contract]."  *Great Am. Opportunities,* 2010 WL 338219, at *9.  In their post-trial brief, the Defendants re-style this element as "Mr. Zachman's Intentional Act Caused The Contracts To Be Terminated"; interference with contract requires the defendant contribute to a *breach*, not merely a termination.  Defs.' Opening Post-Trial Br., at 22.

47

longer had an American presence, a true fact, and insinuating that dealing with such an entity is riskier than dealing with an American entity, is not, *per se*, unjustified competition.[232] Zachman, at the time he took the acts complained of, was not a fiduciary for Real Time Data, nor has the Intervenor-Defendant pled a cause of action sounding in breach of fiduciary duty. Some of Zachman's behavior, post-termination, such as directing his son to interfere with the relationship between the Company and its outside counsel, is not admirable, but again, the Intervenor-Defendant has not pled unfair competition, only interference with its contractual relationship with customers.

The Intervenor-Defendant, in post-trial briefing, makes a half-hearted effort to suggest that Zachman's use of Real Time Data's customer list to contact and poach clients is the unjustified act leading to liability for intentional interference with contract.[233] The counterclaim, I note, stated a cause of action for improper use of trade secrets concerning the customer list, but the Defendants did not brief the issue post-trial, and I deem the claim waived. Can the same claim support the interference tort? I make no determination whether the Delaware Trade Secret Act[234]

---

[232] DX 15 (June 27, 2012 email) ("My primary concern with my former clients is that [Real Time Data] is now controlled by an India operation which provides you no recourse should there be any issues. I would suggest that you consider an alternative."). DX 15 does not include page numbers.

[233] Defs.' Opening Post-Trial Br., at 26.

[234] 6 *Del. C.* §§ 2001–2009.

has preempted this common law tort where premised on misuse of trade secrets, because the trial record is bereft of evidence that Real Time Data's customer lists were maintained as trade secrets.[235]   The Intervenor-Defendant has failed to demonstrate that Zachman's efforts to poach customers were unjustified, rather than permitted, competition; therefore, I find that this counterclaim cannot support an offset against the amounts owed Zachman.

## III. CONCLUSION

The Defendants' Daubert Motion and Motion *in Limine* to Bar Testimony Because of Plaintiff's Discovery Abuse are denied. The Defendants' Summary Judgement motion is moot.   I deny the Intervenor-Defendant's counterclaims for conversion and tortious interference with contract.   The Defendants are liable for breach of fiduciary duty and must pay the Plaintiff the value of his interest in Real Time Data as of the date of the Merger in October 2012.   I find the value of Zachman's interest is $173,000, plus interest at the legal rate.[236]   The parties should confer and submit an appropriate form of order.

---

[235] In their mooted Motion for Summary Judgement, the Defendants attached a statement from Chhabra asserting, in conclusory fashion, that customer lists were treated as trade secrets, but that statement was not made a part of the trial record. *See* Defs.' Opening Summ. J. Br., App'x, at 115–16 (unsworn foreign declaration from Chhabra stating, "[t]he list of [Real Time Data] clients contained information that was not available as a compilation from public records and was kept confidential by [Real Time Data] before it was used by James Zachman to contact [Real Time Data] clients.").

[236] *Citrin v. Int'l Airport Centers LLC*, 922 A.2d 1164, 1167 (Del. Ch. 2006) ("A central purpose of pre-judgment interest is to ensure that a plaintiff to whom payment was owed does not suffer injury by the defendant's unjustified delay.  By requiring the defendant to pay a fair rate of interest

during the period of unjustifiable delay, pre-judgment interest helps make the plaintiff more whole, while depriving the defendant of a windfall.").